JUDGE SCHEINDLIN

# 12 CIV 9339

ANDREW M. CALAMARI
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
(212) 336-1100



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| -against- | : |
| DANNY GARBER,<br>MICHAEL MANIS,<br>KENNETH YELLIN,<br>JORDAN FEINSTEIN,<br>ALUMA HOLDINGS LLC,<br>AZURE TRADING LLC,<br>COASTAL GROUP HOLDINGS, INC.,<br>GREYHAWK EQUITIES LLC,<br>LEONIDAS GROUP HOLDINGS LLC,<br>THE LEONIDAS GROUP LLC,<br>NISMIC SALES CORP.,<br>THE OGP GROUP LLC,<br>PERLINDA ENTERPRISES LLC,<br>RIO STERLING HOLDINGS LLC,<br>SLOW TRAIN HOLDINGS LLC, and<br>SPARTAN GROUP HOLDINGS LLC, | : **COMPLAINT**<br>: **AND JURY DEMAND**<br>: **ECF CASE** |
| Defendants. | : |

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Danny Garber ("Garber"), Michael Manis ("Manis"), Kenneth Yellin

("Yellin"), Jordan Feinstein ("Feinstein"), Aluma Holdings LLC ("Aluma"), Azure Trading LLC

("Azure"), Coastal Group Holdings, Inc. ("Coastal"), Greyhawk Equities LLC ("Greyhawk"),

1

Leonidas Group Holdings LLC ("Leonidas"), The Leonidas Group LLC ("Leonidas Group"),

Nismic Sales Corp. ("Nismic"), The OGP Group LLC ("OGP"), Perlinda Enterprises LLC

("Perlinda"), Rio Sterling Holdings LLC ("Rio Sterling"), Slow Train Holdings LLC ("Slow

Train"), and Spartan Group Holdings LLC ("Spartan") (collectively, the "Defendants"), alleges:

## SUMMARY

1.      From at least January 2007 through at least early 2010, the Defendants purchased

over a billion unregistered shares in dozens of penny stock companies (the "Penny Stock

Companies") and illegally resold the shares to the investing public without complying with the

registration provisions of the federal securities laws.

2.      The Defendants acquired the Penny Stock Companies' shares at a deep discount

of about 30 to 60 percent off of the market price.  Then, contrary to representations that the

Defendants made to the Penny Stock Companies when they obtained the shares, the Defendants

immediately dumped the shares on the market for a large, virtually guaranteed profit.  The

Defendants obtained approximately $17 million in proceeds from these sales.

3.      To effectuate their scheme, the Defendants typically, and falsely, claimed that

their purchases of these stocks were exempt from registration under Rule 504(b)(1)(iii) of

Regulation D ("Rule 504(b)(1)(iii)") [17 C.F.R. § 230.504(b)(1)(iii)] of the Securities Act of

1933 ("Securities Act") [15 U.S.C. § 77a et seq.].  The federal registration requirements protect

investors by promoting full disclosure of information deemed necessary for informed investment

decisions.  Investors who later purchased the Penny Stock Companies' shares were deprived of

such protections by the Defendants' misconduct.

4.      In order to create the appearance that the claimed exemption was valid, the

Defendants, among other things, created virtual corporate presences in Minnesota, Texas and

2

Delaware. They also made misleading statements in documents provided to the Penny Stock Companies, including misrepresentations about their intent to hold the shares for investment purposes and not immediately resell them, and about the identity and principal place of business of the entity Defendant signing the subscription agreement (*i.e.*, the nominal purchasing entity).

5.    The Defendants also obtained attorney opinion letters that generally referenced and incorporated the Defendants' misrepresentations about the nominal purchasing entity and its plans with respect to re-sale, *i.e.*, that they had investment intent, and then concluded that the Penny Stock Companies' issuances of securities were exempt from registration pursuant to Rule 504(b)(1)(iii). The Defendants used these attorney opinion letters to obtain, from the Penny Stock Companies' transfer agents, stock certificates without restrictive legends. The restrictive legends—which should have been on the stock certificates because the Rule 504(b)(1)(iii) exemption did not actually apply—would have prevented the Defendants from immediately dumping the newly acquired shares on the market.

6.    Because the requirements of Rule 504(b)(1)(iii) were not satisfied and no other exemptions from registration were applicable, the Defendants could not legally resell the shares, as they did, in the days and weeks after obtaining them.

7.    In addition to selling over a billion shares purportedly under Rule 504(b)(1)(iii), in some instances, the Defendants obtained shares from the Penny Stock Companies by purchasing convertible notes, which supposedly represented debts owed by the Penny Stock Companies to third parties. The Defendants then converted the debts into unregistered shares and immediately sold them, claiming incorrectly that they were permitted to sell the shares pursuant to Rule 144 of the Securities Act ("Rule 144") [17 C.F.R. § 230.144].

3

8.     These sales were also unlawful. Rule 144 requires that a purchaser hold the shares until the expiration of a holding period, which was generally one year after acquiring the shares. To evade this requirement, the Defendants obtained attorney opinion letters, stating, falsely, that the stock certificates could be issued without restrictive legends because the holding period had been satisfied. The removal of the restrictive legends from the certificates facilitated the unlawful, immediate re-sale of the shares.

## VIOLATIONS

9.     By virtue of the foregoing conduct and as alleged further herein, the Defendants, directly or indirectly, singly or in concert, have engaged in acts, practices, transactions, and courses of business that violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.     Unless the Defendants are restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

12.     The Commission seeks a final judgment:

a)     Permanently enjoining the Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder (pursuant to Section 20(b) of the Securities Act [15

U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]);

b)   Ordering each Defendant to submit a verified accounting to determine the amount of ill-gotten gains received as a result of the conduct alleged herein;

c)   Ordering the Defendants to disgorge their ill-gotten gains with prejudgment interest thereon, jointly and severally;

d)   Ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

e)   Permanently prohibiting the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

f)   Permanently enjoining Garber from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the purchase, offer or sale of any security in an unregistered offering by an issuer; and

g)   Any other relief the Court may deem appropriate.

## JURISDICTION AND VENUE

13.   This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  The Defendants, directly

or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of businesses alleged herein.

14.     Venue lies in the Southern District of New York, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  The Defendants transacted business, including certain of the acts, practices, transactions, and courses of business alleged in this Complaint, within the Southern District of New York.

## DEFENDANTS

15.     **Garber,** age 47, resides in Emerson, New Jersey.  Between 1993 and 1996, Garber worked in the securities industry as a registered representative at several broker-dealers and held Series 7, 24 and 63 licenses.  Garber pled guilty to criminal securities fraud charges in *U.S. v. Garber*, CR-00727(RJD) (E.D.N.Y. June 5, 2002).  Garber's principal occupation is investing.  Garber is a principal of Defendants Perlinda, Aluma, Greyhawk, Slow Train, OGP and Rio Sterling.   Garber used these entities to facilitate his illegal stock transactions.

16.     **Manis**, age 46, resides in Westbury, New York.  Manis's principal occupation is investing.  Manis provides investment management services and other financial advisory services to clients, and has over 15 years of experience doing so.  Manis is a principal of Defendants Perlinda, Aluma, Greyhawk, Nismic, Azure, Leonidas, Leonidas Group, Spartan, Rio Sterling, Slow Train, Coastal and OGP.   Manis used these entities to facilitate his illegal stock transactions.

17.     **Yellin**, age 41, resides in Jericho, New York.  Between 1994 and 2002, Yellin worked in the securities industry as a registered representative at several broker-dealers and held Series 6 and 63 licenses.  Yellin's principal occupation is investing.  Yellin is a principal of

Defendants OGP, Slow Train and Rio Sterling.  Yellin used these entities to facilitate his illegal stock transactions.

18.     **Feinstein**, age 41, resides in Syosset, New York.  Between 1994 and 2001, Feinstein worked in the securities industry as a registered representative of several broker-dealers and held Series 7 and 63 licenses.  Feinstein's principal occupation is investing.  Feinstein is a principal of Defendants OGP, Slow Train and Rio Sterling.  Feinstein used these entities to facilitate his illegal stock transactions.

19.     **Aluma** is a New York limited liability company with its principal place of business in New York.  Aluma is owned and controlled by Manis and Garber.

20.     **Azure** is a New York limited liability company with its principal place of business in New York.  Manis is Azure's managing member.  Azure uses many d/b/a names, including: Aluma, Coastal, Cobra Management, EPH Holdings, Great Federal Holdings, Global Visions, Greyhawk Holdings, Kaivalya Ltd., Leonidas Group, Nismic Sales and Perlinda Holdings.

21.     **Coastal** is incorporated in New York with its principal place of business in New York.  Coastal provides investment management services and other financial advisory services to clients.  Manis is Coastal's Chairman and Chief Executive Officer.

22.     **Greyhawk** is a Texas limited liability company, which purports to have its principal place of business in Austin, Texas.  Greyhawk has no known employees or actual business operations in Texas.  Garber and Manis are Greyhawk's principals.  Manis and Garber also incorporated an entity with this name in New York.

23.     **Leonidas** is a New York limited liability company with its principal place of business in New York.  Manis is Leonidas's managing member.  Leonidas uses many d/b/a

7

names including: Aluma, Atrium Equities, Avonova Capital, Cavbus Trading, Coastal, Cobra Management, E.P. Group, EPH Holdings, Global Visions, Great Federal Holdings, Greyhawk Holdings, Kaivalya Ltd., KSC Trading, Madison Equities, Marlboro Partners, Nismic, Perlinda, WW Capital and Zum Zum Trading.

24.     **Leonidas Group** is a New York limited liability company with its principal place of business in New York.  Manis is a member of Leonidas Group.

25.     **Nismic** is either an inactive New York corporation with its principal place of business in New York or a trade name used by Manis, doing business as Nismic Sales Corp. Manis controlled Nismic.  The name "Nismic Sales" was also used as a d/b/a by Azure and Leonidas.

26.     **OGP** is a New York limited liability company with its principal place of business in New York.  OGP's members are Manis, Garber, Feinstein and Yellin.  OGP has various d/b/a names, including Perlinda, Slow Train and Rio Sterling.

27.     **Perlinda** is a New York limited liability company, with its principal place of business in New York.  Perlinda also maintains addresses in Texas and Minnesota.  Manis and Garber own and control Perlinda.

28.     **Rio Sterling** is a Texas limited liability corporation, which purports to have its principal place of business in Texas.  Rio Sterling has no known employees or actual business operations in Texas.  Rio Sterling also maintains addresses in New York.  Rio Sterling's principals are Garber, Manis, Feinstein, and Yellin.  Rio Sterling is also a name used as a d/b/a of OGP.

29.     **Slow Train** is a Delaware limited liability company, which purports to have its principal place of business in Delaware.  Slow Train has no known employees or actual business

8

operations in Delaware.  Slow Train's primary mailing address is in New York.  Slow Train's members are Manis, Garber, Feinstein and Yellin.

30.     **Spartan** is a New York limited liability company with its principal place of business in New York.  Manis is Spartan's managing member.  Spartan has many d/b/a names including Coastal, Great Bull Management, Modena Capital, and Leonidas Group.

## FACTS

31.     The Defendants obtained and illegally resold the stock of dozens of Penny Stock Companies, reaping millions of dollars in profit while depriving the investing public of the protections of the registration provisions of the securities laws.  The Penny Stock Companies traded only on the "over-the-counter" market and were quoted by OTC Markets Group, Inc., formerly known as the Pink Sheets, an electronic quotation and trading system, and had limited assets, low share prices, and little or no analyst coverage.  During the relevant period, the stocks of these companies were "penny stocks" as defined by Section 3(a)(51)(A) of the Exchange Act [15 U.S.C. § 78c(a)(51)(A)], meaning that, among other things, they traded below five dollars per share and were not listed on a national securities exchange.

32.     Section 5 of the Securities Act prohibits any person, directly or indirectly, from offering or selling any security unless a registration statement is filed as to such offer, and is in effect as to such sale, or unless an exemption from registration is available.  In this case, no registration statements were filed or in effect in connection with either the initial issuance of shares to the Defendants, or the Defendants' sales of those shares to the public, and no exemptions from registration were available to the Defendants for their sales of those securities to the public.

33.     Rule 504(b)(1)(iii) provides an exemption from registration for certain limited offers and sales of securities only if the offers and sales are made "[e]xclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to 'accredited investors' as defined in [Rule] 501(a)." Accredited investors are investors who meet certain income or net worth requirements. General solicitation and general advertising includes advertisements published in newspapers, magazines, and unrestricted websites; communications broadcast over television and radio; and seminars whose attendees have been invited by general solicitation or general advertising.

34.     The Defendants' transactions did not qualify for the Rule 504(b)(1)(iii) exemption from registration for a variety of reasons, including that none of the nominal purchasing entities actually operated in Minnesota, Texas or Delaware and none of the stock transactions occurred in these states. Moreover, the Minnesota, Texas, Delaware, and New York state law exemptions that the Defendants claimed did not satisfy the Rule's requirements and, with respect to the claimed Texas exemptions, the Defendants failed to comply with Texas law.

35.     The Defendants also made material misrepresentations or omissions to issuers, transfer agents, and brokers to effectuate their Rule 504(b)(1)(iii) transactions.

36.     Under another provision of the securities laws known as Rule 144, a purchaser may resell unregistered securities if the purchaser has held the securities for a so-called "holding period," usually one year. If certain criteria are met, the purchaser can satisfy this holding period by "tacking" back to the date the original stockholder acquired the unregistered security. In a number of instances, the Defendants made it appear that they had satisfied the holding period, when in reality they were just converting a debt to a security and immediately reselling the stock.

37.     For example, on at least one occasion, certain Defendants did not satisfy Rule 144 because the convertible debt they acquired from the issuer was not a "security." Thus, they could not "tack" their holding period back to the date the debt was created and promptly resell the stock.

38.     On another occasion, certain Defendants did not satisfy the holding period or requirements of Rule 144 because, among other reasons, they paid additional compensation to the issuer for the convertible note.

## The Defendants' Rule 504(b)(1)(iii) Scheme

39.     Since at least January 1, 2007 and continuing until at least early 2010, the Defendants improperly claimed exemptions from registration pursuant to Rule 504(b)(1)(iii) for more than 200 stock transactions, and obtained proceeds in excess of $15 million from the sale of unregistered shares wrongfully issued pursuant to the Rule.  Although the Defendants purportedly relied on various state law exemptions, the reality was that the individual and entity Defendants operated exclusively out of New York and New Jersey.  The few entity Defendants that were registered to do business, or incorporated, in Minnesota, Texas and Delaware never had more than virtual offices with no employees in those states.  The individual Defendants never visited those offices.  The transactions occurred in New York and New Jersey, and the transfer agents sent the stock certificates to the Defendants in these two states.  In other words, the Defendants' use of Minnesota, Texas, and Delaware state law exemptions was a sham.

40.     The Defendants' Rule 504(b)(1)(iii) scheme had seven steps, as outlined below.

41.     **First**, the Defendants created virtual corporate presences in Minnesota, Texas and Delaware purportedly to avail themselves of those states' exemptions from registration of securities.

11

42.     In March 2006, Manis and Garber acquired a virtual Minnesota address for Perlinda, a New York corporation, and registered Perlinda in Minnesota. The Minnesota address belongs to a virtual office that Manis and Garber have never visited or used for any purpose other than as a mail drop. Perlinda had no employees in Minnesota. The purported Minnesota presence was a sham.

43.     In late 2007, Minnesota repealed the state law exemption. Even after the Minnesota provision was repealed, however, Garber, Manis and Perlinda purported to rely on this provision for about a dozen additional transactions.

44.     To continue to acquire shares pursuant to Rule 504(b)(1)(iii), Garber and Manis began to rely on Texas state law exemptions and to represent Perlinda as an entity based in Texas, even though it had no connection to Texas. Garber and Manis also used Greyhawk to acquire shares in supposed reliance on Texas state law and Rule 504(b)(1)(iii). Perlinda and Greyhawk never had more than virtual offices in Texas. Neither Garber nor Manis ever visited the so-called Texas offices. They had no employees in Texas. The Defendants effectuated the stock purchases from New York and New Jersey. In other words, the purported Texas presence was a sham.

45.     In 2008, Manis and Garber began doing business with Feinstein and Yellin. These four Defendants incorporated Rio Sterling in Texas, but this entity only had a virtual office, which none of the four individual Defendants ever visited or used for any purpose other than as a mail drop. Rio Sterling had no employees in Texas. The Defendants effectuated the stock purchases from New York and New Jersey. The purported Texas presence was a sham.

46.     After the Defendants learned that Commission staff was investigating Perlinda and looking into misuses of the Texas state law exemption, they began also claiming an

12

exemption under Delaware law.  The Defendants incorporated Slow Train in Delaware, and several months later, after participating in at least one Rule 504 transaction, rented a virtual office in Delaware.  The four individual Defendants never visited the Slow Train office or used it for any purpose other than as a mail drop.  Slow Train had no employees in Delaware.  The Defendants effectuated the stock purchases from New York and New Jersey.  The purported Delaware presence was a sham.

47.     In addition to Rio Sterling and Slow Train, the four individual Defendants also created OGP in New York.  Each of the four individual Defendants had an equal 25% stake in Rio Sterling, OGP and Slow Train and shared profits equally on all Rule 504(b)(1)(iii) deals in which these entities participated.

48.     **Second**, Manis and Garber, and later Yellin, identified and targeted penny stock companies that needed capital.

49.     The individual Defendants then executed materially misleading subscription agreements with the Penny Stock Companies, on behalf of one or more of the entity Defendants, to obtain millions of shares at a deep discount from the market price.  The subscription agreements were contracts between the nominal purchasing entity and the Penny Stock Company issuer in which the entity agreed to buy the stock, purportedly pursuant to Rule 504(b)(1)(iii) and one of the state law exemptions from registration.  The discount ranged from about 30 to 60 percent.

50.     The subscription agreements between the Defendants and the Penny Stock Companies were misleading for various reasons, most often because they misrepresented that the entity Defendant was purchasing the shares for investment purposes, that is, with the intent to hold the shares, as opposed to buying the shares in order to promptly resell them for a large,

virtually guaranteed profit.  The subscription agreements often falsely described the nominal purchasing entity, stating that it was domiciled or had its principal place of business in Minnesota, Texas, or Delaware (as needed by the Defendants to give their state law exemption claims a veneer of legitimacy), when in fact all of the entities were operated from the homes or offices of the four individual Defendants in New York and New Jersey.

51.     For example, on about July 20, 2007, Manis signed two subscription agreements, on behalf of Perlinda and Aluma, respectively, each for the purchase of 100 million shares of Issuer A.  Both agreements stated that the "[p]urchaser has no present intention to sell the Common Stock" and that "[the purchaser] will hold these securities for a minimum of 12 months."  Manis also signed many other subscription agreements for the purchase of Issuer A's shares containing the same representations, including: (i) 100 million shares by Nismic on July 9, 2007; (ii) 125 million shares by Coastal on May 24, 2007; and (iii) 125 million shares by Azure on May 19, 2007.  In reality, Perlinda, Aluma, Nismic, Coastal and Azure promptly sold the stock within weeks of purchase.  Manis, a sophisticated investor, either knew, or recklessly disregarded, that the statements in the subscription agreements were false when made.

52.     On June 2, 2009, Garber signed a subscription agreement on behalf of Greyhawk for the purchase of 15 million shares of Issuer B for $15,000.  In the subscription agreement, Garber represented that the purchaser "was not formed to evade and is not, in connection with this investment, evading the registration requirements of the Securities Act" and that the "Shareholder will not engage in any activity that will constitute a distribution of the shares." (The term "distribution" refers to the sale of a large amount of stock into the market.)  Garber deposited the stock certificate into a Greyhawk account on June 3, and sold all of the shares

within two days. Garber, a sophisticated investor, either knew, or recklessly disregarded, that the statements in the subscription agreement were false when made.

53. On June 29, 2009, Yellin signed a subscription agreement on behalf of Delaware-incorporated Slow Train for the purchase of 52 percent of the public float of Issuer C's shares, totaling 1,250,000 shares, for $25,000. The subscription agreement stated that Slow Train maintained its principal place of business in Delaware, and stated that the "undersigned will not engage in any activity that will constitute a distribution of the Shares" and is "experienced in such matters and understands the applicable laws and regulations." In reality, Slow Train had no place of business in Delaware, it was based in New York and had not even rented a virtual office in Delaware. Moreover, Yellin's plain intent was to complete a distribution, and Slow Train sold the shares within seven weeks of purchase. Yellin, a sophisticated investor, either knew, or recklessly disregarded, that the statements in the subscription agreement were false when made.

54. **Third**, the Defendants retained attorneys to draft opinion letters stating that the transfer agents could issue the penny stock certificates without a restrictive legend, enabling an immediate resale to the public. The premise of these letters was incorrect, as discussed below, for a variety of reasons. Most of all, neither the Defendants nor the transactions had any connection to Minnesota, Texas, or Delaware. Moreover, the state law exemptions that the Defendants relied upon did not satisfy the requirements of Rule 504(b)(1)(iii) and, with respect to Texas, the Defendants failed even to satisfy the Texas rules.

55. The opinion letters were based on the Defendants' false representations, which were reiterated from the subscription agreements. Specifically, the subscription agreements misstated that the purchaser had investment intent, would not use the shares in a distribution and, often, misstated the nominal purchaser's nexus to the state. For example, an attorney stated in an

15

August 2008 opinion letter for Rio Sterling's purchase of 10 million shares pursuant to Rule 504(b)(1)(iii) and Texas state law that: Rio Sterling will "not use the shares in a distribution," has "investment intent," has its "principal place of business . . . within the State of Texas and has business interests [other than this offering] within the State of Texas." All of these representations were false.

56.     The attorney opinion letters were also misleading because they portrayed Perlinda and other entity Defendants as based in whatever state suited the transaction at hand. As an example, within a two-week period in 2007, and for the purpose of acquiring stock from various Penny Stock Companies, Manis and his attorney described Perlinda as "an accredited New York investor;" Garber signed a subscription agreement describing Perlinda as "an entity formed pursuant to the laws of Minnesota and maintain[ing] its principal place of business within the state of Minnesota;" an attorney opinion letter described Perlinda as a shareholder "formed or incorporated pursuant to the laws of the State of Minnesota with its principal place of business in the State of Minnesota;" and another attorney opinion letter from the same attorney described Perlinda as a shareholder "formed or incorporated pursuant to the laws of the State of Texas with its principal place of business in the State of Texas."

57.     The Defendants knew that the opinion letters were provided to transfer agents in order to obtain un-legended stock certificates. (The Penny Stock Companies used transfer agents to, among other things, handle the issuance of stock certificates.) The Defendants also knew, or recklessly disregarded, that statements in the opinion letters were false when made.

58.     **Fourth**, the Defendants caused the opinion letters to be submitted to the transfer agents in order to obtain unregistered shares. After reviewing the attorney opinion letters, which falsely stated that Rule 504(b)(1)(iii) was satisfied, the transfer agents issued stock certificates

without restrictive legends, in the names of the nominal purchasing entity Defendants. In almost every instance, the shares were delivered to the individual Defendants at their homes or offices, or to their brokerage firms in New York or New Jersey, regardless of the supposed principal address of the nominal purchasing entity in Texas, Minnesota or Delaware.

59.   **Fifth**, the Defendants frequently deposited the stock certificates into numerous brokerage accounts in the names of the New York entities OGP, Azure, Leonidas, Spartan and Perlinda.

60.   These brokerage accounts were often in the name of a different entity than the one listed on the stock certificate (and named in the subscription agreement). For example, on more than 100 occasions, the subscription agreement was signed by Perlinda (at least 75 times in its guise as a Minnesota entity and at least 25 times in its guise as a Texas entity) and the shares were issued to Perlinda. On these occasions, the Defendants did not deposit Perlinda's stock certificates into a Perlinda brokerage account or even into the account of a Minnesota or Texas entity. In nearly every instance, the shares issued to Perlinda were deposited directly into Azure's and Leonidas's accounts, both of which are New York corporations with no connection to Minnesota or Texas, not even a mail drop.

61.   As another example, after the Defendants began using Rio Sterling (when claiming the Texas exemption) and Slow Train (when claiming the Delaware exemption), the certificates issued in the names of Rio Sterling and Slow Train were – on at least 45 occasions – deposited directly into the account of New York corporation OGP. In some instances, to effectuate the deposit, the Defendants misrepresented to the brokers that the entity named on the certificate was merely a d/b/a name of OGP when, in fact, this was not true. OGP has no connection to Texas or Delaware, not even a mail drop.

62.     Manis signed misleading deposit forms and submitted them to brokers.  For example, Issuer D issued Rio Sterling 27 million shares, purportedly under a Texas exemption, on May 1, 2009.  Manis signed a certificate deposit form in which he represented to the brokerage firm that "Rio Sterling is a DBA of OGP."  This statement was false.  The Rio Sterling entity that acquired the shares was a wholly different corporate entity that was not a d/b/a of OGP.  Manis, as a sophisticated investor, knew or recklessly disregarded that his representation regarding Rio Sterling was false when made.

63.     Garber signed misleading deposit forms that were submitted to brokers.  For example, Issuer C issued about 52 percent of its public float, totaling 1,250,000 shares, for $25,000 to Slow Train on July 1, 2009.  New York entity OGP actually paid for the shares.  Yellin promptly deposited the stock certificate (in the name of Slow Train) in an account of OGP, on July 2, 2009, along with a stock power signed by Feinstein and a deposit form signed by Garber representing that Slow Train was a d/b/a of OGP.  This statement was false.  The Slow Train entity that acquired the shares was a wholly different corporate entity that was not a d/b/a of OGP.  Garber, as a sophisticated investor, knew or recklessly disregarded that his representation regarding Slow Train was false when made.

64.     Feinstein signed numerous stock power agreements that enabled the Defendants to deposit shares issued to one entity Defendant into the account of another entity Defendant.  For example, on or about August 10, 2009, Issuer E issued 2 million shares to Rio Sterling.  Feinstein signed the stock power and deposited the shares into OGP's brokerage account after Manis represented to that brokerage firm that Rio Sterling was a d/b/a of OGP.  This representation was false.  Although Manis filed papers with the New York State Department of State Division of Corporations that listed the name "Rio Sterling" as a d/b/a of OGP, the Rio

Sterling entity named on the stock certificate was a wholly different corporate entity that was not a d/b/a of OGP. The Defendants sold all shares by August 26, 2009. Feinstein, as a sophisticated investor, knew or recklessly disregarded that the forms he submitted were misleading because they omitted material information that the accountholder and certificate holder were different entities.

65.   **Sixth**, the Defendants quickly sold the Penny Stock Companies' shares for a sizeable profit, contrary to the representations in the subscription agreements and attorney opinion letters, warranting that they had investment intent and would not distribute the shares. Most sales occurred within days or weeks. Since the purchase price was heavily discounted, from about 30 to 60 percent of the prevailing market price, the Defendants were all but guaranteed a hefty profit.

66.   **Seventh**, the Defendants frequently repeated their scheme by purchasing many more tranches of shares from the same Penny Stock Companies after liquidating their positions.

67.   The Defendants were aware that owning more than ten percent of the Penny Stock Companies' outstanding shares would severely limit the number of shares they could sell under the securities laws. In a July 2007 email to an issuer, Garber declined to purchase additional unregistered shares because "if we do more stock right now we will be deemed insiders." An August 2009 email from an attorney to an issuer, and copied to Garber and Yellin prior to a purchase, noted that: "[a]pplicable securities laws define an affiliate as a person, such as a director, officer or large shareholder (ten percent or greater)." Yellin told another issuer in a February 11, 2010 email that "[w]e are doing this in 2 tranches to assure that we stay below 10%." (An "affiliate" of the issuer is subject to restrictions on the sale of the issuer's unregistered stock.)

19

68.     The Defendants, therefore, sometimes acquired positions just under ten percent in any one tranche.  They also frequently divided the shares among several of the entity Defendants and other entities controlled by Garber's friends.  For example, from January 12, 2009 through August 13, 2009, Issuer D issued to Rio Sterling nearly 40 percent of its outstanding shares in eight tranches.  Two of the tranches were each just under ten percent of the issued and outstanding shares at the time of issuance.  Rio Sterling sold all the shares within weeks.  At the same time that this company issued these shares to Rio Sterling, the company issued similarly large blocks of shares to entities controlled by Garber's friends.  Combined, Issuer D issued nearly 75 percent of its outstanding stock to those entities and Rio Sterling during the first eight months of 2009.

### The Defendants' Scheme Did Not Comply with Rule 504(b)(1)(iii).

69.     The Rule 504(b)(1)(iii) exemption was not available because (a) the state statutes the Defendants purportedly relied on did not satisfy the requirements for an exemption from registration under of Rule 504(b)(1)(iii); (b) with respect to Texas, the Defendants did not comply with the requirements of Texas law; and/or (c) with respect to Texas, Delaware and Minnesota, the transactions lacked a sufficient nexus to those states.

### The State Law Exemptions Do Not Satisfy Rule 504(b)(1)(iii).

70.     The state law provisions on which the Defendants purportedly relied, as evidenced by the subscription agreements and attorney opinion letters, were: (i) Minnesota Statute § 80A.15(2)(g)(2006), repealed as of August 1, 2007 [M.S.A. § 80A.15(2)(g) (2006), repealed by 2006 c. 196, art. 1, § 51, eff. Aug. 1, 2007] ("Minnesota Statute 80A.15(2)(g)"); (ii) Texas Rule 109.4 [Tex. Admin. Code, tit. 7 § 109.4] ("Texas Rule 109.4") and Texas Rule 139.16 [Tex. Admin. Code, tit. 7 § 139.16] ("Texas Rule 139.16"); (iii) Section 7309(b)(8) of the

Delaware Securities Act [redesignated as 6 Del. C. § 73-207 (Nov. 14, 2011)] ("Delaware Section 7309(b)(8)"); and (iv) New York's Martin Act [New York General Business Law Art. 23-A] ("New York Martin Act").

71.     As noted, Rule 504(b)(1)(iii) provides an exemption from registration for certain limited offers and sales of securities only if the offers and sales are made "[e]xclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to 'accredited investors' as defined in [Rule] 501(a)."

72.     Texas Rule 109.4 does not satisfy Rule 504(b)(1)(iii) because this provision does not permit general solicitation or general advertising.  To the contrary, it exempts the "offer and sale" of securities to "institutional accredited investors," "qualified institutional buyers," and other specific types of entities.  Because the Texas rule, by its terms, limits the types of investors to whom the shares may be offered, the rule prohibits general solicitation to all members of the public.  Therefore, sales made pursuant to this provision do not qualify for the exemption from registration under Rule 504(b)(1)(iii).

73.     Texas Rule 139.16 does not satisfy the requirements of Rule 504(b)(1)(iii).  This exemption from registration expressly applies only to offers and sales made "without advertising," or only with "limited use advertising" under certain circumstances.  Thus, contrary to the requirements of Rule 504(b)(1)(iii), Texas Rule 139.16 does not permit general solicitation and general advertising.

74.     Minnesota Statute 80A.15(2)(g), now repealed, did not satisfy Rule 504(b)(1)(iii) because the Minnesota statute did not limit sales to accredited investors.  This state provision exempted from registration any offer or sale to any institutional buyer, "whether the purchaser is acting for itself or in some fiduciary capacity."  The definition of institutional buyer included,

but was not limited to, accredited investors.  Moreover, the Minnesota rule does not expressly permit general solicitation and general advertising.  Effective August 2007, this exemption was repealed.  The Defendants' subsequent use of the provision, on about a dozen occasions, also was unjustified.

75.     Delaware Section 7309(b)(8) does not satisfy Rule 504(b)(1)(iii).  Like Texas Rule 109.4, Delaware Section 7309(b)(8) exempts "offers" to certain accredited investors and several specifically enumerated types of institutions.  A general solicitation, by contrast, is one directed at the public at large, which means that it reaches both accredited and non-accredited investors.  Therefore, Section 7309(b)(8) does not permit general solicitation.

76.     New York Martin Act does not satisfy Rule 504(b)(1)(iii) because there is no New York State exemption requiring that sales be made to accredited investors.

77.     Thus, regardless of the language in the attorney opinion letters, the Rule 504(b)(1)(iii) exemption was unavailable to the Defendants' transactions.

### The Defendants Did Not Comply with the Texas Exemptions from Registration.

78.     To the extent that the Defendants claimed to rely on Texas law as the basis for an exemption under Rule 504(b)(1)(iii), they did not comply with the Texas requirements.  Texas Rule 139.16 explicitly applies only to sales to "individual accredited investors," defined to include only certain natural persons or self-directed employee benefit plans.  Here, all of the sales were made to entities.  The other possibly applicable Texas Rule, Rule 109.4, is available only to an institutional investor who purchases "for its own account."  On dozens of occasions, however, in which the Defendants purported to rely on this rule, the stock certificate was issued to Perlinda or Rio Sterling (the entities that signed the subscription agreement) and deposited directly into a brokerage account of another entity.

<u>The Transactions Lacked a Sufficient Nexus to Minnesota, Texas and Delaware.</u>

79.     The transactions had no meaningful connection to Minnesota, Texas and Delaware that would enable the Defendants to avail themselves of the state law exemptions.

80.     Throughout the relevant period, all of the individual Defendants lived in New York and New Jersey, handled communications regarding the stock purchases from New York and New Jersey, maintained all records in New York and New Jersey, and directed that stock certificates be mailed to them in New York and New Jersey.  In most cases, the Defendants deposited the shares into their New York and New Jersey-based brokerage accounts and paid transaction costs using bank and brokerage accounts in the name of New York entities with New York mailing addresses.

81.     The only connection the transactions had with Minnesota, Texas or Delaware was the existence of a mail drop or virtual office that the individual Defendants never visited and which was never used to conduct any business.  Moreover, the entity Defendants had no purpose other than to provide Delaware, Texas or Minnesota addresses to make the Rule 504(b)(1)(iii) scheme seem legitimate.

<u>The Issuer F Offering Exceeded $1 Million<br>and is Disqualified from Rule 504(b)(1)(iii)</u>

82.     Between December 5, 2007 and April 21, 2009, the Defendants, along with other entities owned and operated by Garber's friends, paid $1.25 million to Issuer F for unregistered shares, in purported reliance on Rule 504(b)(1)(iii).  The Defendants purchased the shares in 29 tranches during the seventeen-month period.  There was at most, a three-month gap between any of the 29 issuances.

83.     In order to qualify for a Rule 504(b)(1)(iii) exemption, an offering cannot exceed $1 million in proceeds during a twelve-month period.  In addition, an "integrated" offering

cannot exceed $1 million in proceeds, even if the entire offering spans more than twelve months.
Rule 502(a) of Regulation D [17 C.F.R. § 230.502(a)] provides that offers and sales are deemed
a single offering, *i.e.,* "integrated" if the sales are continuous and overlapping without a 6-month
gap between issuances.  Issuer F's offering exceeded $1 million and was continuous and
overlapping.

### The Defendants' Convertible Debt Scheme

84.     As part of their scheme to acquire and sell unregistered securities, the Defendants
wrongly evaded Rule 144's one-year holding period by engaging in a convertible debt scheme in
which they would sell unregistered shares immediately after acquiring them.   To accomplish
this scheme, the Defendants searched the market for convertible "aged debt," meaning debt that
had been on a penny stock issuer's books for at least as long as the Rule 144 holding period.  The
Defendants purchased the debt from the long-term creditors. They then procured attorney
opinion letters stating that the debts were securities and could be converted to stock certificates
without any restrictive legends because the original debt had been outstanding for more than one
year.

85.     Once the Defendants obtained the share certificates without the restrictive
legends, they promptly sold the shares in the market.  The Defendants obtained proceeds from
the convertible debt scheme of more than $1 million.

86.     The Defendants did not satisfy Rule 144 because the original debt was not a
security.  In many instances, for example, the original debt was akin to an "IOU" for services
rendered or compensation owed to a current or former affiliate of the issuer.

87.     For example, on or about March 11, 2009, Rio Sterling purchased, for $2,500, a
$27,500 debt that Issuer G owed to a vendor for services rendered in 2006.  Garber signed a

"Settlement Agreement" on behalf of Rio Sterling in which Issuer G agreed that this debt could be converted to shares "issued free of restrictive legend pursuant to Rule 144." The document also provided that "[s]uch shares are to be issued with a tacking period based on the original debt owed." This meant that the holding period would be measured not from the date that Rio Sterling acquired the debt, but rather from the date the debt arose to the original issuer. The original debt, however, was not a security: it was a debt owed for services rendered. Thus, tacking was not permitted and the shares were actually restricted.

88.     As another example, Issuer H purportedly owed its CEO money pursuant to a deferred compensation agreement. In early September 2009, the CEO assigned a portion of the debt to Rio Sterling in exchange for $25,000. The CEO, as a director of Issuer H, signed a board consent approving the conversion of the debt into unregistered shares. The company then issued unregistered shares to Rio Sterling. The corresponding attorney opinion letter supported the issuance and resale of the unregistered shares on the basis that the Defendants had satisfied the Rule 144 holding period because the original debt had existed for more than one year. This opinion letter failed to disclose that (i) the debt was for deferred compensation and was not a security; (ii) the seller was the CEO of the issuer; and (iii) the issuer, via the CEO, orchestrated the entire transaction. Any one of these factors was sufficient to invalidate the claimed exemption from registration.

### FIRST CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Against all Defendants)**

89.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if fully set forth herein.

90.     The Penny Stock Companies' shares that the Defendants sold constitute "securities" within the meaning of Section 2(a)(l) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

91.     At all relevant times, the Penny Stock Company shares that the Defendants sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

92.     The Defendants, therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

93.     By reason of the activities described herein, Defendants, singly or in concert, directly or indirectly, violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Against all Defendants)**

94.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if fully set forth herein.

95.     The Defendants, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

and (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

96.     By reason of the foregoing, the Defendants, singly or in concert, directly or indirectly, violated, and unless enjoined and restrained will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against all Defendants)**

97.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if fully set forth herein.

98.     As alleged herein, all of the Defendants, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or with reckless disregard for the truth: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

99.     By reason of the foregoing, the Defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## RELIEF SOUGHT

**WHEREFORE,** the Commission respectfully requests that the Court issue a Final Judgment:

### I.

Permanently enjoining the Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder (pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]);

### II.

Ordering each of the Defendants to submit a verified accounting to determine the amount of ill-gotten gains received directly or indirectly as a result of the misconduct alleged in this Complaint;

### III.

Ordering each of the Defendants to disgorge, with prejudgment interest thereon, all ill-gotten gains received directly or indirectly as a result of the misconduct alleged in this Complaint, jointly and severally;

### IV.

Ordering each of the Defendants to pay civil monetary penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(u)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**V.**

Imposing a permanent bar on the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

**VI.**

Permanently enjoining Garber from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the purchase, offer or sale of any security in an unregistered offering by an issuer; and

**VII.**

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
        December 21, 2012

                                       Andrew M. Calamari
                                       Regional Director
                                       Michael Paley
                                       Assistant Regional Director
                                       Attorney for Plaintiff
                                       SECURITIES AND EXCHANGE
                                       COMMISSION
                                       New York Regional Office
                                       3 World Financial Center, Suite 400
                                       New York, New York 10281-1022
                                       (212) 336-1100
                                       CalamariA@sec.gov
                                       PaleyM@sec.gov

Of Counsel:
Paul G. Gizzi (GizziP@sec.gov)
Haimavathi V. Marlier (MarlierH@sec.gov) *(not admitted in New York)*
Laura V. Yeu (YeuL@sec.gov)